RAYE, P. J.
*990 The jury's verdict finding defendant Markece Jovon Chatman guilty of pimping and pandering was based on the testimony of a prostitute, who admitted lying and told vastly different stories each time she gave a statement or testified, the text messages she exchanged with defendant, and a letter defendant wrote to a woman in Texas pleading with her to claim in an affidavit that she sent the text messages to the prostitute. On appeal, defendant alleges that instructional error and ineffectiveness of counsel necessitate reversal of the judgment. We disagree and affirm the judgment.
FACTS
Antoinette was unhappy living at home with her mother, stepfather, and other relatives. She had no income and felt "out of place" and "lost." She wore a necklace with the ashes of her son. Her cousin, who had been working as a prostitute, encouraged Antoinette to join the profession and when she agreed, the cousin schooled her on the way to make a living and stay reasonably safe. The cousin advertised Antoinette's services on Backpage.com, a website utilized by prostitutes and their customers. The cousin also introduced Antoinette to defendant so he would help with her prostitution.
*991 The introductions were by phone calls and text messages. Defendant was listed as "Dad Mob" in Antoinette's contacts. She *140 explained that a pimp is often referred to as dad or daddy by a prostitute. Defendant asked Antoinette for a picture and asked who had advertised on her behalf. He complimented her on the picture and assured her they would "go get on us [sic ] a program." He told her he wanted to take her on a trip to the Bay Area. When she specifically asked if he would have her "walking," defendant responded, "[j]ust a lil" and volunteered to post ads for her services on the internet. On the first day they met in person, they left Sacramento for the Bay Area.
Given the inconsistencies in Antoinette's testimony and statements to the police, it is nearly impossible to construct a timeline of what happened and when. What is clear from the record is that Antoinette spent about a week with defendant, leaving Sacramento and traveling with him to Vallejo, San Jose, Concord, and San Francisco. She left Sacramento with hopes of having a romantic relationship with him while working together to expand her business opportunities. In Vallejo, defendant picked up some provocative clothes from a storage unit for Antoinette to wear while she worked. Antoinette testified defendant dropped her off in San Jose, handing her condoms and warning her not to engage in prostitution with black men. She was more successful in Concord where she had three or four car dates having either oral sex or intercourse with her clients.
How much money she actually made, if any, walking the streets and getting dates, including car dates, is unclear. She testified business was sometimes poor, the relationship with defendant soured quickly, defendant slapped her, they slept in their car, and she asked her mother to send her money. On one occasion, Antoinette sent defendant a text informing him that someone was following her. He responded, "Just walk and pay attention to the money but watch yo back ok im.out and stay off phone till serious." While the details shifted with each telling, she consistently testified that defendant advertised her services, encouraged her to commit acts of prostitution, and reaped the benefit of the money she earned. Indeed, she testified she gave defendant all the money she earned as a prostitute during the time they were together. He used the money to buy food and gas.
Midway through the trip to the Bay Area, Antoinette's cousin appeared. At trial, Antoinette remembered that day as lucrative. Again she gave all the proceeds to defendant.
Antoinette became disillusioned with defendant and prostitution. On one occasion, a customer tried to hit her with his car. Scared, she called defendant who insisted "bitch, stay out there." In San Francisco, Antoinette was unsuccessful landing any customers despite walking the streets for a few *992 hours and the tension between Antoinette and defendant grew. At one point, defendant became angry when he saw her talking to different men. He took her into an alley and, choking her, ordered her not to "do no shit like that again." In response to her complaint he was hurting her, defendant responded, "Bitch, I don't give a fuck."
By then, Antoinette wanted to go home but defendant told her "no, to go and make some more money." She finally "had enough." Unbeknownst to defendant, she called another cousin to pick her up. Scared of defendant, she left with her cousin without her suitcase, her clothes, her medication, her identification, and, most importantly, the necklace with her son's ashes. She later attempted to get her property back from defendant but was unsuccessful.
They corresponded by text messages after she returned to Sacramento. He wrote:
*141 "[W]e can work around jail all u gotta do is dress a certain way and once we leave the bay its a different ball game but u panic and not giving me the time [¶] ... I need with us so u can understand any thing im go be by yo side and love u hold u laugh with u and enjoy life to the fullest if u stop these mixed though [¶] ... [¶] Its yes or no u comin home so we doing us mfs just trying leave cali and be happy it get tough and hard but its about us but if its not good baby im done [¶] ... [¶] My family know i pimp but know u my girl I got yo shit put up right now like I care [¶] ... Im cool nett dont hit my phone or try and text me if u not fucking with me all this is just slowing me down i dont let nothing come inbetween or stop my program ...."
There were several text messages retrieved from Antoinette's cell phone involving actual prostitution transactions with customers requesting a "30 qky," referring to a quick 30-minute prostitution encounter and another asking if the texter could pay a $30 donation for a 15-minute quickie. In yet another text exchange, Antoinette and her customer negotiated a quickie in her car.
In a letter addressed to a woman in Texas, defendant, while incarcerated, asked the woman to sign an affidavit that she used his phone to send text messages to Antoinette about pimping and prostitution because she was jealous of Antoinette.
Defendant did not testify and presented no evidence in his defense.
*993 DISCUSSION
I
Pandering When the Victim is Already a Prostitute
Defendant was convicted of pandering in violation of Penal Code section 266i, subdivision (a)(1), not subdivision (a)(2). A person violates subdivision (a)(1) when he or she "[p]rocures another person for the purpose of prostitution." ( Pen. Code, § 266i, subd. (a)(1).) Subdivision (a)(2) includes several other elements providing, in pertinent part, that any person who "[b]y promises, threats, violence, or by any device or scheme, causes, induces, persuades, or encourages another person to become a prostitute" is guilty of pandering. ( Pen. Code, § 266i, subd. (a)(2).) Defendant contends the trial court erred by refusing his proposed modification to CALCRIM No. 1151 and his lawyer provided constitutionally deficient representation by failing to request additional modifications. Having conducted a de novo review of the alleged instructional error, we conclude his arguments are without merit. ( People v. Posey (2004) 32 Cal.4th 193, 218, 8 Cal.Rptr.3d 551, 82 P.3d 755.)
Defendant submitted the following proposed instruction:
"The defendant is charged in Count 1 [sic ] with pandering in violation of Penal Code section 266i(a).
"To prove that the defendant is guilty of this crime, the People must prove beyond a reasonable doubt the following elements:
"1. The defendant successfully caused, induced, persuaded or encouraged Antoinette Doe to become a prostitute;
"2. The defendant successfully caused, induced, persuaded or encouraged Antoinette Doe to become a prostitute by promises, threats, violence or any device or scheme;
"AND
"3. The defendant intended to influence Antoinette to be a prostitute.
"Whether Antoinette was a prostitute before meeting the defendant is not a bar to pandering." (Fn. omitted.)
*142 *994 The trial court found the proposal inaccurate in part and no better than the standardized instruction in part. The court instructed the jury on pandering as follows:
"The Defendant is charged in Count 2 with pandering in violation of Penal Code section 266i. To prove that the Defendant is guilty of this crime, the People must prove that, one, the Defendant successfully persuaded Antoinette Doe to become a prostitute, and, two, the Defendant intended to influence Antoinette Doe to be a prostitute.
"It does not matter whether Antoinette Doe was a prostitute already." ( CALCRIM No. 1151, as given.)
Defendant's modification to the instruction and his claim his lawyer should have attempted to modify it even further is based on a misreading of People v. Zambia (2011) 51 Cal.4th 965, 127 Cal.Rptr.3d 662, 254 P.3d 965 ( Zambia ). The most obvious flaw in defendant's argument is the fact Zambia was prosecuted under Penal Code section 266i, subdivision (a)(2), not subdivision (a)(1). As the trial court found, the prosecution had no burden to prove element No. 2 of the proposed modification that defendant used "promises, threats, violence, or any device or scheme" to encourage Antoinette to engage in prostitution. The court quite properly struck that part of the proposed instruction as it was not an element of the charged offense.
But the thrust of defendant's argument on appeal is his notion that if the pandering involves a person who is already engaged in prostitution, Zambia requires a change in the prostitute's business model or the establishment of new working relationships in the trade as a result of the panderer's involvement. It is true that the focus of the analysis in Zambia was the statutory language contained in subdivision (a)(2) "to become a prostitute." And the question was whether a prostitute could "become" what she already was. The court recognized "that when a pimp offers protection and support to a prostitute in return for some or all of her income, the offer increases the likelihood that the prostitute will be able to maintain or expand her activities, an outcome squarely at odds with the statutory goal." ( Zambia, supra , 51 Cal.4th at p. 974, 127 Cal.Rptr.3d 662, 254 P.3d 965.) The court further found that "[t]o encourage an established prostitute to change her business relationship necessarily implies that a defendant intends a victim 'to become a prostitute' in the future regardless of her current status." ( Id. at p. 975, 127 Cal.Rptr.3d 662, 254 P.3d 965.)
Again we point out that the targeted language "to become a prostitute," while central to the analysis in Zambia , is not an element of the pandering offense with which defendant was charged and convicted. Penal Code section 266i, subdivision (a)(1) requires only that a defendant "[p]rocures another *995 person for the purpose of prostitution." As a result, Zambia 's extensive analysis of what it means to become a prostitute is inapplicable to a subdivision (a)(1) prosecution.
Nevertheless, because the trial court instructed the jury that "[t]o prove that the Defendant is guilty of this crime, the People must prove that, one, the Defendant successfully persuaded Antoinette Doe to become a prostitute" with the additional caveat, "[i]t does not matter whether Antoinette Doe was a prostitute already," we briefly address the defendant's misunderstanding of Zambia 's holding. Defendant reads Zambia to require a change in a prostitute's business model. In his view, if Antoinette merely maintained the same type of prostitution business she operated before they met, then he was not guilty of pandering and the jury should have been *143 instructed on this important nuance. His lawyer, he insists, was incompetent for failing to request an instruction capturing the significance of the requisite change in business model or change in her working relationship.
Zambia does indeed focus on the prostitute's future behavior. But the involvement of a pimp or panderer almost by definition changes the prostitute's business. As quoted above, the court in Zambia recognized that the protection provided by a pimp, in conjunction with the services he provides in advertising the prostitute's services and encouraging her to engage in prostitution, promotes her business and influences her future conduct. ( Zambia, supra , 51 Cal.4th at pp. 974-975, 127 Cal.Rptr.3d 662, 254 P.3d 965.) To overcome the argument that a prostitute already in the business cannot "become a prostitute" if she already is one, the court necessarily emphasized how the pimp or panderer's involvement influences her future behavior. Thus, although she had been a prostitute in the past and/or continued to be a prostitute in the present, a pimp's assistance facilitated her prostitution in the future and met the statutory definition.
Defendant, however, overstates the type and degree of change that must occur in the prostitute's operations. He suggests a wholesale revision in the business model is needed to demonstrate that the panderer had a palpable impact on the success of the business endeavor. In the absence of a significant change in how a prostitute does business, defendant maintains the pimp or panderer has not influenced her future behavior, has not contributed to additional prostitutes on the street, and has not committed the evil the pandering statute is designed to prevent. We disagree this is what Zambia requires, what the statute requires, or what common sense requires.
" 'The purpose of the anti-pandering statute [citation] is to "cover all the various ramifications of the social evil of pandering and include them all in the definition of the crime, with a view of effectively combating the evil *996 sought to be condemned." [Citations.]' " ( Zambia, supra , 51 Cal.4th at p. 973, 127 Cal.Rptr.3d 662, 254 P.3d 965.) Moreover, " '[a] substantial potential for social harm is revealed even by the act of encouraging an established prostitute to alter her business relations. Such conduct indicates a present willingness to actively promote the social evil of prostitution.' [Citation.]" ( Id . at p. 974, 127 Cal.Rptr.3d 662, 254 P.3d 965.)
The caveat the court gave the jurors correctly emphasized that the fact Antoinette was already a prostitute did not matter. We agree with the trial court the defendant's proposed modification instructing the jurors that "[w]hether Antoinette was a prostitute before meeting the defendant is not a bar to pandering" did not improve or clarify the standardized language in any meaningful way. The court did not err by refusing such an inconsequential alteration of the time-tested standardized instruction. There was no instructional error. And because we reject defendant's characterization of the Zambia holding and conclude the prosecution need not demonstrate a demonstrable change in the prostitute's business model, defendant's lawyer did not fail to provide constitutionally adequate representation.
II-IV**
DISPOSITION
The judgment is affirmed.
We concur:
ROBIE, J.
BUTZ, J.

See footnote *, ante .