Filed 9/5/25  P. v. Brown CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>WILLIE DONTE BROWN,<br><br>Defendant and Appellant. | F087441<br><br>(Super. Ct. No. BF189948A)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Marcus Cuper, Judge.

Scott Concklin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez, and Hannah Janigian Chavez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# INTRODUCTION

Officers with a multi–agency human trafficking operation responded to an on–line advertisement from Samanda Hall and arranged a "date" for sexual services in a Bakersfield hotel room. Appellant Willie Donte Brown and Hall arrived together. After Brown dropped her off, he left and waited in a different hotel's nearby parking lot. Hall was detained, and made several incriminating statements, after which Brown was arrested.

A jury convicted Brown of one count of pimping (Pen. Code,[1] § 266h, subd. (a)), and one count of pandering by receiving money or a thing of value for procuring another person for the purpose of prostitution (§ 266i, subd. (a)(6)). The trial court separately found that Brown had previously been convicted of a strike offense (§§ 667, subds. (c)–(j) & 1170.12, subds. (a)–(e)), and that three aggravating sentencing factors were true (Cal. Rules of Court, rule 4.421(b)(2), (b)(3), & (b)(5)). Brown was sentenced to an aggravated term of six years on the pimping count, which was doubled to 12 years based on the strike prior. A similar 12–year sentence was imposed on the pandering count but was stayed pursuant to section 654.

On appeal, Brown contends there was/were:

(1) Insufficient Evidence: Neither conviction is supported by sufficient evidence.

(2) Faulty Jury Instructions: The trial court prejudicially erred by:

(a) Failing to modify sua sponte the standard instruction on the pimping count with a more complete mens rea instruction;

(b) Modifying the standard instruction on the pandering count to tell the jury that the term "procure" includes circumstances in which a defendant "assists" a prostitute in their already–established and on–going prostitution endeavors; and

(c) Failing to provide unanimity instructions on both counts.

---

[1] All undesignated statutory references are to the Penal Code.

(3) Ineffective Assistance of Counsel: Trial counsel was constitutionally ineffective for failing to object to testimony from a police detective witness who:

(a) Expressed an inadmissible opinion on guilt; and

(b) Couched portions of his testimony with allegedly improper gender–based stereotypes of males during his explanations of the pimping and pandering subculture and the commercial sex trade.

## FACTS

Because Brown raises insufficiency of the evidence claims as to both counts, we must lay out the underlying facts in some detail, but we do so as we must in the light most favorable to the jury's verdicts. (*People v. Abilez* (2007) 41 Cal.4th 472, 504.) Additional facts relevant to the other issues Brown raises are found in the discussion below.

### A. The "Sting"

As part of a joint state and federal human trafficking task force operating in Bakersfield, Kern County Sheriff's Sergeant James Newell was assigned as a "chatter." He would go on–line looking for websites that advertised potential prostitution opportunities in the area and then contact the phone numbers listed in these ads. On April 23, 2022,[2] Newell visited "Skipthegames.eu" and found a local listing with a phone number for a Samanda Hall.

Newell texted Hall and in their ensuing conversation he agreed to pay her $250 for one hour of intercourse and oral sex at a Bakersfield Holiday Inn. Hall said she would arrive at 8:00 p.m., and would be wearing a red jacket and orange shorts. Newell then notified the arrest team of these details.

At about 8:00 p.m., FBI Special Agent Jason Coffey was waiting near the back of the Holiday Inn and watched as a Nissan Altima arrived and a woman in a red jacket got

---

[2] All undesignated dates are to 2022 unless otherwise indicated.

out of the passenger seat. Coffey relayed the vehicle information to a marked Bakersfield police patrol car — also part of the task force — waiting nearby and, after the Nissan drove away, Coffey approached and detained the woman. She identified herself as Samanda Hall.

Meanwhile, the patrol car officers found the Altima parked in the lot of another hotel about five hundred yards from the Holiday Inn. Brown was in the driver's seat, and was on his cell phone when he was contacted by the officers. He was detained and his phone was seized, as was Hall's, and a cache of text messages between the two was later forensically extracted.

**B. Hall's Interview**

Bakersfield Police Detective Kameron Bailey was a member of the task force, and he interviewed Hall at the scene that evening.

Hall first told Bailey that Brown had no job she knew of, nor did he receive any government assistance. She said they had been having "difficult times" since moving back to California from the state of Washington in January. She did not mention her own sources of income at this point. Hall gave Bailey her and Brown's current and older phone numbers. Her newest number matched the number posted online in the advertisement Newell had used to contact her.

Hall soon told Bailey that Brown was aware that she was going to the Holiday Inn for a "commercial" sex date. She identified her ad on "Skipthegames.eu," but tried to claim this was only her first time.[3] When Bailey told her that he had found several older ads, she then conceded that she indeed had been earlier involved in prostitution, but only for a day or two, and had only made about $300 in the previous two weeks.

---

[3] Bailey later testified that it is common for prostitutes to minimize how long they have been involved in the trade because they think they will be in less trouble. Similarly, they will often also try to minimize the involvement of their "partner" by saying they did not approve of it or even that they had told them not to engage in prostitution.

Hall also said she had previously plied the trade in Los Angeles two years prior, where she gave the money she made to someone named "Manook," and gave Bailey Manook's Snapchat information. After working for "Manook," however, she said she did not engage in prostitution again until March 2021, but then only for a month or two on seven or eight occasions. She eventually admitted there was a third occasion in November 2021, but insisted she stopped prostituting after that.

Regarding Brown, Hall first told Bailey that Brown had found out only a couple days before that she worked as a prostitute, and only because she "kind of told him." She then waffled and said that Brown had first known two *weeks* before, and then a *month* before.

As to her more recent activities, Hall told Bailey she had made $40 the previous day, and used $20 to put gas in Brown's car and the other $20 to buy lunch for the two of them. She said Brown had "maybe" driven her to her "dates" two or three times in the past, and that the money she made on these dates was used to pay for the hotel rooms where she and Brown stayed.[4]

Finally, Hall admitted that she had been arranging some of her most recent dates at the Bakersfield Vagabond Inn[5] hotel room where she and Brown were staying. She said this included about eight or nine "incall" dates over the past few months, including one recent occasion when she had three or four on the same day.

---

[4] Bailey explained to the jury that a "date" in the sex worker trade is "when a commercial sex worker performs sex acts in return for money."

[5] Bailey testified that the Vagabond Inn was well–known to police as a location for "incall" prostitution activity. An "incall" date is when the sex worker receives their customer "wherever they're staying, whether it's a house, [or] typically a hotel that they're staying in." In contrast, an "outcall" date is when the customer has the sex worker come to their location and "perform the date there," like the Holiday Inn rendezvous Newell had arranged with her. Bailey added that the Vagabond Inn was also a common location for truck drivers to park their rigs and was a third alternative, a so–called "truck date."

## C. The Text Messages

The cell phones contained a host of salient text messages between Brown and Hall. At trial they were introduced, with Bailey providing a running commentary to explain to the jury the meanings of the applicable lexicon as well as further explaining the underlying common characteristics of the commercial sex trade. His testimony was based on his training and experience as a detective on the Bakersfield police vice squad and the "Vice Detail Human Trafficking Task Force" of which he was a team member, as well as personal conversations with "over a hundred" prostitutes and "several dozen" pimps and human traffickers.[6] For clarity, we provide Bailey's comments in parentheses as they were made as each of the text messages were produced to the jury as People's Exhibit 4.

On March 24, almost a month before Brown's arrest, his phone messages showed Hall texts to him. Her first text said, "Got my regular on his way, $250 for an hour." (Bailey said Hall was referring to a regular sex customer she had charged $250 for a one–hour date, which was the same price that she quoted to Newell on April 23.) Brown responded, "What the fuck y['a]ll talking foe?" and "Did he do what he supposed to?" (Brown was asking whether the customer completed the sex act for the agreed–upon $250.) Hall replied, "Man [D]onte[7] this a regular u can't just rush and I got 250 but he getting dressed [right now]. I have known him three years from this and he always a loyal 250 customer." Brown texted back, "Alright." (Because this was one of Hall's regulars, she wanted to maintain a good relationship with her customer so she could continue to date him for $250; he also was a "loyal $250 customer" she had known for *three* years.

---

[6] Bailey's qualifications to provide this background testimony were not challenged and his running commentary was admitted without objections.

[7] Brown's middle name is Donte, a name Hall used.

Hall was reassuring Brown that she could not rush her customers, implying that Brown had a continuing interest in this long–time source of her money.)

Two minutes later, Hall texted Brown, "W[here] Y[ou] A[t] babe and I couldn't tell him who u was [or] he would have took his money left and never came back u know I don't tell people u my brother so don't start [D]onte like f[or] r[eal] f[or] r[eal]." (The customer likely saw Brown at some point, but Hall did not want to tell him that she was Brown's girlfriend because the customer would stop dating her; customers, especially regulars, think they have developed a special relationship with a commercial sex worker, and they do not want to deal with pimps.)

Three hours later, Hall texted Brown, "I just don't understand how u take ur anger from the streets out on me. I lay here making as much money as I can daily and give u everything[.]" (Hall was discussing how she was having sex for money and that she gave it all to Brown.) Two hours later, she texted, "U don't love me u don't care about me. I will just be homeless and broke. It don't mean shit to u to leave because u got a pocket full of money and u good I'm not." (Hall meant that she had no money, again showing that she gave all the money she made to Brown or had to spend it on hotel rooms, food, and gas. In addition, it meant Brown had a "pocket full of money," even though she had earlier told Bailey that Brown "ha[d] no source of income at all.")

Eight minutes later, Hall told Brown, "Ur a mark and a bitch u take everything from me and that sad … u don't care and don't love me," and "U can stay gone. U a thief a fake pimp." (Capitalizations omitted.) (Hall was upset that Brown took all the money that she made from her sex work, but left her with nothing. Hall called Brown a "thief" because he took all her money, and called him a pimp because he was sexually exploiting her.)

She added, "U don't have a job u don't have shit all u have is what u got from me …. U never loved me u never gave a fuck. All u ever wanted was the money." (This showed that Brown had no income of his own and was only getting money from Hall

7.

through her sex work.  Bailey said such arguments are common in "[a]lmost every phone that [he] go[es] through involving boyfriend pimps and victims."  Moreover, it was not only common to every sex worker's phone that Bailey had examined, but is repeated "over and over and over."  It also showed Hall knew that Brown only pretended to be her boyfriend to take her money.)

Several minutes later, she texted, "I lay on my back every fucking day for u and u let whatever else bothering u come home and take shit out on me. … How is it I been home all day, tryna make bread so we can survive, but when you come home, u trip."  Followed by, "I have no where to go … I have NO money.  U have it all[.]"  "I am the one who made the bread and we would be broke if it wasn't for me and I can't have shit or get shit[.]  "So maybe I did fuck up giving u the money because that's all u want.  U don't want me or any of that so I should have kept it so I wouldn't be homeless with no place to go.  That's sad u say u no the game but I don't see it. … Give u everything take care of u and u don't appreciate it u don't care."  ("Bread" meant money and Hall was saying she gave Brown all the money she made from her sex work, leaving her with nothing.  The "trip" reference meant that Hall was also upset because Brown was spending all the money that she made while he was out with other people.)

Brown did not respond to any of these March 24 texts from Hall.

On March 28, Brown finally replied to Hall, "Can't wait to really elevate with you and take our game to another level."  ("Elevate" is a common term used by sexual exploiters to describe the need to make more money, and "our game" referred to their working together to make money from her sex work.  It also meant Brown was trying to get back on Hall's good side after not responding to her for four days.)

On March 31, Hall texted Brown "LOL, it's a regular of mine," and Brown replied, "That ain't no regular."  Hall replied, "Fed ex driver dad lol."  (This indicated that Brown was watching at the time and saw Hall's customer arriving for a date, but he did not think he was a regular.)  Several minutes later, Hall texted Brown, "Okay.  He

8.

getting dressed," and Brown responded, "He's gone." (This showed that Brown had watched when and where Hall's dates occurred until he saw the customer leave and the date was over.)

On April 5, while awaiting for a date to arrive, Hall texted Brown, "I love u [a]nd I apologize for anytime I was wrong or ou[t] of pocket and did realize it o[r] played it wrong I love u [a]nd want nun but love and happiness for us." ("Out of pocket" is a common term used in the sex trade to describe an exploited victim being disobedient or not listening to their exploiter.)

On April 6, Hall texted Brown, "It's supposed to be one on his way he was stopping at a store somewhere close he said to get a rubber. So just wait, because he might be [on the way] or almost here when u get back[.]" Ten minutes later, she texted, "He is getting off on olive [right now] he said." (It was common for sex workers to constantly keep their pimps closely informed of the progress of their dates and how much money they were making.) Similarly, on both April 9 and 10, Brown texted Hall, asking "You good," and "He comin or what?" (Showing that Brown was checking on her and wanted to be updated because she was not updating him sufficiently.)

On April 11, Hall texted Brown, "He tryna send me the money we haven't did none but if he can't he gunna go to the bank and come back or come Thursday," and "I still have clothes on and everything." Hall added, "If he ain't on his way back in like 7 min then I'ma say fuck it," and Brown replied, "Yup." (Hall was letting Brown know that she had yet not been paid so she had not done anything sexual with the customer. These messages were significant because they showed that Brown had an interest in the money Hall was making and that she was reassuring him that she had not performed any sex acts without being paid.)

When Hall told Brown, "Ok he went to bank," Brown texted, "Alright I'm here across the w[a]Y," and "Holla if u need me." Ten minutes later, Hall texted Brown, "U can come get me," and Brown replied "Yup come outside." (This was to tell Hall that

9.

she could rely on him if she needed help or protection. The fact that Hall and Brown continued to text about the status of this customer also showed that they were working together as a team.)

On April 14 Hall texted "Done he getting dressed hj." ("HJ" meant "hand job," a common paid service and one that Hall had told Bailey she performed.) On April 15, Hall texted, "He about to leave And got 160," and Brown responded, "ThTs right, baby." (Showing that Brown acknowledged that she made $160 for the date and was encouraging her.) On April 16, one week before Brown's arrest, Hall texted him and said that her date was not coming, and "U can come back he not responding or anything so come on," and Brown replied, "Alright." (Showing how she kept Brown updated and that Brown could come back to their hotel room, implying that Brown had left the room so she could take an incall date.)

### D. Hall's Testimony

Hall's trial testimony in October 2023 was rife with numerous inconsistencies, odd explanations for some of her text messages with Brown, and even a refusal to testify at one point despite having been immunized. It finally devolved into her claims she had no memory of her earlier statements to Bailey nor much else.

First, Hall testified that Brown was her "husband," and she had known him for about three years. She then admitted that they were only "engaged," not legally married, and that they were in fact not even currently living together. She said she cared about Brown, loved him, and would not like it if he were to be found guilty.

Hall only slightly recalled speaking to Bailey at the Holiday Inn back in April 2022. On that day, she said she had received a text message setting up an outcall date worth $250 in order to get "funeral donations" money for her mother's funeral. Her "husband" Brown did drop her off at the Holiday Inn, but she had told him she was going

10.

to her "cousin's" hotel room to visit for two or three hours.[8]  She said she did not tell Brown to wait for her.

Hall then said she did not know that she could get arrested for engaging in prostitution.  She also could not recall when she first started prostituting herself, but once more claimed that the online date she arranged with Newell was the first time she had done so, despite having posted advertisements for two years, and her times in Los Angeles with "Manook."

She then adjusted her story again and said she had not engaged in prostitution before going to Washington state in December 2021, but soon admitted that she had actually had a date on the day prior to April 23 when she was interviewed by Bailey.

Hall claimed not to remember if she ever had any incall dates at hotels, and denied ever having sex in vehicles or by outcalls to other people's locations.  She denied having regular clients but admitted she had standard rates — although she could not recall what they were — despite only having engaged in prostitution once, and then only on the day before.

Hall said she had regular jobs at the time.  She said she worked at a Bakersfield steak house, tutored children, and braided hair, although she could not recall whether she had told Bailey about these latter two occupations.  At first she said she did not remember that she told Bailey that she had left the restaurant job two weeks prior to April 23, but eventually admitted she had done so.  She also did not remember telling Bailey that prostitution was her only source of income or that she said she "won't be doing it after today."

---

[8] No evidence of Hall's mother's funeral, or even death, was produced.  Similarly, this "cousin" was never identified, nor were the "family and friends" she was going to "kickback" with.  Hall claimed that Brown did "not like the family member I was going to be with," and said she had used the same lie to Brown previously.

11.

Hall did not recall whether Brown was employed at the time or was receiving government assistance despite having told Bailey otherwise. She insisted that over the three years they had been together, Brown had been employed "close to all of" that time. She admitted she had several cell phones but did not recall whether Brown had multiple phones; she could not remember either her own or Brown's phone numbers, and she could not recall giving Brown's phone number to Bailey.

Hall explained the March 24 texts about her "regular" being on his way and her making $250 for an hour, was about someone whose hair she braided and that she charges $250 to braid hair. When Brown texted to ask if her customer did "what he was supposed to do," she claimed Brown was asking her if the customer sent money to her Cash App account. She also insisted that some of her male clients have their hair braided while they are naked, which was the reason she texted Brown that her customer was getting dressed. Indeed.

Hall was then presented with the March 24 texts to Brown and asked about how Brown had a "pocket full of money," despite not having a job or receiving government assistance. She claimed he had "family members to help him."

Regarding her text message to Brown stating that she laid on her back every day for him and yet when he came home, he took "shit out on me," Hall claimed she was merely discussing how she stays at home all day, braiding hair and waiting for him to come home, and insisted that "laying on her back" was not about having sex with other people.

When Hall was asked about her text to Brown where she said she gave him everything, took care of him, and he did not appreciate it because he did not care, she said she did not know what she was talking about in that message. As for Brown's text message to her that said, he could not wait "to really elevate you and take our game to another level," she claimed that was about the two of them doing better, getting an apartment, and getting married.

12.

Hall was then asked about the text on April 6, where she told Brown: "It's supposed to be one on his way he was stopping at a store somewhere close he said to get a rubber. So just wait, because he might be [on the way] or almost here when u get back[.]" She admitted that a "rubber" is a condom, but did not know why she told Brown about a condom since she was only braiding hair. However, she finally admitted that someone was paying her to braid their hair *and* have sex with them. She also conceded that Brown knew that her client was coming over to have his hair braided, and also that she was going to have sex with this client, but insisted that this was not prostitution.

Regarding the April 11 texts to Brown, "He tryna send me the money we haven't did none but if he can't he gunna go to the bank and come back or come Thursday," and "I still have clothes on and everything," Hall said these messages were about how she had not braided her client's hair because he did not have money. She did not explain why *she* needed to take her own clothes off, as well as the client's, in order to braid his hair.

Hall was then asked about the April 15 text that her client was about to leave, but she again claimed that it was a client whose hair she braided for $160. She insisted that all of these text messages to Brown were about her braiding hair and that the money she gave Brown was from braiding hair. Despite what she had told Bailey, she claimed that Brown was not aware that she was engaged in prostitution and that he had never made her do so. She denied ever discussing being a prostitute with Brown or saying that she had regular clients. However, when confronted with her statements to Bailey, she finally conceded she had told Bailey that Brown knew what she was going to the hotel for, and that Brown was to be waiting and parked nearby for her safety, if a need arose.

As her story expanded, Hall also admitted that she made $120 from a truck date two days before the April 23 incident, although she could not recall exactly how she made that money. She still did not recall telling Bailey that she had made $300 in the past two weeks.

13.

Hall did not remember being asked about when she first became a prostitute, or saying that she had "tried" being a prostitute two years before. She did not recall working for someone named "Manook," or telling Bailey about him, and had not engaged in prostitution at Manook's request. She did not remember telling Bailey that she had engaged in prostitution in March 2021 for two months, or that she went on seven to eight dates, or that she had also plied the trade in November 2021.

Similarly, she did not recall telling Detective Bailey about how Brown discovered that she was a prostitute, how Brown gave her a ride to her dates, that the money she made from prostitution was used for their hotel rooms, or that she had dates at the hotels where she was staying, including the notorious Vagabond Inn. When Hall was reminded that when she was detained, she did not have her driver's license, CashApp card, or EBT card, she claimed that Brown had them in his wallet because she had no pockets and she did not want to lose them.

Finally, she maintained she was never concerned about being arrested when she encountered so many police at the Holiday Inn that day because she "didn't do nothing." She continued to claim she did not know that she could get arrested for engaging in prostitution.

After her interview with Bailey, she declined a ride home in an unmarked police car because it might hurt her "business," but said that this meant her tutoring business and work with school districts, not her sometimes–naked hair–braiding endeavors.[9] Instead, she drove the Nissan Altima she and Brown originally arrived in, once again referring to Brown as her "husband." She said that although she was truthful during her interview with Bailey, she was not really concerned about whether her statements, either at trial or to Bailey on April 23, were in fact true.

[9] No evidence was presented to show that Hall "tutored" anyone or that she had worked "with" any school districts.

14.

### E. Bailey's Opinion

At the end of his testimony, Bailey was asked whether in his opinion Brown "was acting as a pimp towards Ms. Hall," and he gave several reasons for opining that Brown was. There was no objection. On cross–examination defense counsel asked Bailey, "[Y]ou made a conclusion that you believed that Mr. Brown was acting as Ms. Hall's pimp, isn't that true?" Bailey said he did. Counsel then asked, "And when you made that conclusion, that was your opinion, not a legal conclusion, is that correct?" Bailey replied, "Opinion, based off [*sic*] the evidence I've seen."

### F. Defense

Brown chose not to testify, and the defense did not present any evidence.

## DISCUSSION

## I. Sufficiency of the Evidence

Brown first claims that the judgment should be reversed because the evidence was insufficient to support either the pimping or the pandering conviction. We reject the former, but agree with the latter.

### A. Standard of Review

"In reviewing a sufficiency of the evidence claim, the reviewing court's role is a limited one." (*People v. Smith* (2005) 37 Cal.4th 733, 738.) " ' "[W]e review the entire record in the light most favorable to the judgment below to determine whether it contains substantial evidence — that is, evidence which is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Holmes, McClain and Newborn* (2022) 12 Cal.5th 719, 780; *People v. Oyler* (2025) 17 Cal.5th 756, 768, fn. 2 (*Oyler*) [" 'we review in detail the evidence in support of the prosecution's case' [citation] and 'view the evidence in the light most favorable to the judgment below.' "].) " ' "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends." ' " (*People v.*

15.

*Penunuri* (2018) 5 Cal.5th 126, 142.)  The test is " 'whether *any* rational trier of fact could have found the essential elements of the crime … beyond a reasonable doubt' " (*Ibid.,* original italics.)

Moreover, " '[w]e presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence.  [Citation.]  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citation.]  A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' "  (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)  We "can only reject evidence accepted by the trier of fact when the evidence is inherently improbable and impossible of belief."  (*People v. Xiong* (2013) 215 Cal.App.4th 1259, 1268.)[10]

The standard of review is the same whether the prosecution relied on circumstantial evidence or direct evidence.  (See *People v. Westerfield* (2019) 6 Cal.5th 632, 713.)  " 'If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' "  (*Ibid.*)  Thus, " '[w]e must also "accept logical inferences that the jury might have drawn from the circumstantial evidence." ' "  (*People v. Navarro* (2021) 12 Cal.5th 285, 302.)

As a result, "[a] reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict."  (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; *People v. Lochtefeld* (2000) 77 Cal.App.4th 533, 538 [standard of review for assessing the sufficiency of the evidence "is a highly deferential one"].)  Simply put, Brown "bears an enormous burden"

---

[10] As discussed, Hall's trial testimony was all over the place.  In his briefing, Brown myopically focuses on isolated parts of her testimony that are helpful to him, implying that we should too.  However, it was the jury that sifted through the evidence, and it was their resolution of any possible conflicts that counts, not ours.

to prevail on a sufficiency of the evidence claim. (*People v. Sanchez* (2003) 113 Cal.App.4th 325, 330.)

**B. The Pimping Conviction**

Section 266h states in part that "any person who, knowing another person is a prostitute, lives or derives support or maintenance in whole or in part from the earnings or proceeds of the person's prostitution" is guilty of pimping. (§ 266h, subd. (a).) "[D]eriving support with knowledge that the other person is a prostitute is all that is required for violating the section in this manner. No specific intent is required." (*People v. McNulty* (1988) 202 Cal.App.3d 624, 630; *id.* at p. 631 ["Pimping in all its forms is not a specific intent crime."]; see also *People v. Grant* (2011) 195 Cal.App.4th 107, 116, fn. 3 (*Grant*).)

Thus, in order to convict Brown of pimping, the prosecution had to prove that: (1) Brown knew Hall was a prostitute; (2) money he acquired from her came from her prostitution; and (3) the money was used in whole or in part toward his support or maintenance. (See *Grant, supra,* 195 Cal.App.4th at pp. 115-116.) It is not necessary that the money Brown received went *solely* to pay his own expenses. (*People v. Navarro* (1922) 60 Cal.App. 180, 182 (*Navarro*).)

*i. The Date of the Offense:*

Brown first argues his conviction cannot stand because the evidence did not show that he "derived support from the earning[s] of a prostitute on [April 23], even in part," as the pleadings alleged. We agree that Hall did not receive the $250 that Newell agreed to pay her, nor did she perform any sexual acts. Similarly, there is no evidence that Brown received any other prostitution proceeds from Hall that day.

Technically, the pleadings alleged Brown's pimping offense occurred "on or about" April 23. More importantly, pimping is a crime capable of being committed on a "continuous ongoing nature." (*People v. Leonard* (2014) 228 Cal.App.4th 465, 489, 491 (*Leonard*).) Thus, a pimping conviction may rest on evidence of "several discrete events" or be "directed towards a continuous course" of activity that evidences the offense. (*Id*. at p. 492.) In other words, "living or deriving support or maintenance from

17.

the earnings of a prostitute or proceeds of her prostitution knowing her to be a prostitute is an ongoing continuing offense that occurs over a period of time." (*People v. Lewis* (1978) 77 Cal.App.3d 455, 462 (*Lewis*).) The statutory language is "*lives* or *derives* support or maintenance," using temporally open–ended verbs, not "lived" or "derived" on one particular day. If anything, April 23 was an end–date for the offense, not a discrete event that defined it.

Here, the text–message evidence, Hall's statements to Bailey during her interview, and even some of the portions of her evasive testimony, together show that Brown and Hall had been teaming up to prostitute Hall since they returned from the state of Washington in early 2022 up to and until Brown's arrest on April 23, and that Brown had derived support from Hall's earnings from at least March 24 until April 23 of that year. Thus, substantial evidence shows that Hall's earnings from prostitution went to Brown's maintenance and support over that period of time. The mere fact that neither Hall nor Brown received the final $250 that Newell agreed to pay her before the plan was foiled on April 23 is irrelevant.

*ii. Other "Means of Support"*

Brown next claims that any evidence of money he received from Hall was insufficient to show that money went to his "support" because the prosecution failed to "negate the possibility that he had other means of support." Relatedly, he argues there was "no evidence to show how that money was spent."

We first note that "the amount of money which [the] defendant receives from the prostitute is irrelevant for purposes of a pimping conviction." (*People v. Jackson* (1980) 114 Cal.App.3d 207, 210 (*Jackson*).) Second, " '[i]n order to establish that the accused lived and derived support and maintenance from the earnings of prostitution it is not necessary for the prosecution to prove that the money was expended for that purpose.' " (*Id.,* at p. 210; see also *People v. Kennedy* (1962) 200 Cal.App.2d 814, 817; *People v. Courtney* (1959) 176 Cal.App.2d 731, 740; *People v. Jackson* (1954) 128 Cal.App.2d 506, 508-509; *People v. Giambone* (1953) 119 Cal.App.2d 338, 340 (*Giambone*),

18.

disapproved on another ground in *People v. Smith* (1955) 44 Cal.2d 77, 80–81; *Navarro, supra,* 60 Cal.App. at p. 182.)

The support or maintenance element is satisfied when the evidence shows the defendant received some or all of a prostitute's earnings for use as the defendant saw fit, and "[i]t is not a defense that the accused had a sufficient income from other sources," and did not need the prostitute's earnings to pay some or all of their support or maintenance. (*Giambone, supra,* 119 Cal.App.2d at p. 340; *People v. Coronado* (1949) 90 Cal.App.2d 762, 766 (*Coronado*) ["The words '*necessary* support' are not used in the [statute]. … [I]f such earnings are received knowingly and applied to the support of the accused person he would be guilty of pimping regardless of his wealth, possessions or legitimate income from other sources."].) Whether or not Brown had other sources of "support" over and above what Hall gave to him is beside the point, and Brown provides no authority to show that the prosecution had an additional obligation to "negate" such a possibility.

In a related vein, Brown contends that the prosecution must show *how* the money was spent in order in order to satisfy the definition of "support," declaring that mere "[m]oney itself is not 'support,' " and cites *Grant, supra*, 195 Cal.App.4th at 115 in support. However, *Jackson, supra*, 114 Cal.App.3d at p. 210, concluded otherwise: " 'In order to establish that the accused lived and derived support and maintenance from the earnings of prostitution it is *not* necessary for the prosecution to prove that the money was expended for that purpose. [Citation.] It is not a defense that the accused had a sufficient income from other sources[.]' " (italics added), quoting *Giambone, supra,* 119 Cal.App.2d at p. 340.)[11]

To begin, imposing on the prosecution the herculean task of tracing where and how each dollar of the monies received from a prostitute was later used by an accused is neither implied by the statute itself nor is it realistically possible. Street–level pimping

---

[11] Brown did not cite *Jackson* or attempt to distinguish it even after the People did so in their response. We find this silence telling.

19.

and pandering are not trades where discoverable business records are kept, tax returns filed or not filed, or bank accounts used, wherein funds could be traceable by forensic accountants. If Brown is correct in this claim, most pimps could never be convicted if the offense required proof of whether the quotidian proceeds of the prostitute's earnings were then each specifically traceable to use for a defendant's "support" — another term not defined in the statute — or instead were used for other purposes, kept as a cache, or even invested for future endeavors involving the same or other exploited sex workers.

More importantly, *Grant* is inapplicable here because this issue was neither raised nor decided in that case. Instead, *Grant* involved a facial constitutional overbreadth challenge to section 266h itself, where the defendant alleged the statute was unconstitutional because it could encompass otherwise innocent activity. (See *Grant, supra,* 195 Cal.App.4th at pp. 115–116.) Nothing in *Grant* suggests that tracing a defendant's ultimate use of the proceeds received from a prostitute's earnings was relevant to preserving the section's *constitutionality*, let alone that it comprised an additional element and essentially rewrote the statute.

"It is axiomatic that cases are not authority for propositions not considered." (*People v. Ault* (2004) 33 Cal.4th 1250, 1268, fn. 10.) Brown's selective citation to an isolated phrase in *Grant* does not provide support for his argument that in a pimping case the prosecution must prove how the prostitute's proceeds were eventually spent by the pimp.[12]

We find *Jackson* more persuasive here and follow it.

---

[12] The *Grant* court had stated that "the People must demonstrate that 'the money acquired [came] from the earnings of the illicit … prostitution, and [was] used toward the recipient's support or maintenance.' " (*Grant, supra,* 195 Cal.App.4th at p. 115, quoting *Coronado, supra*, 90 Cal.App.2d at p. 767.) However, in the quoted passage from *Coronado,* that court was distinguishing a Montana statute which proscribed receiving money from a prostitute, *regardless of its source*, and had nothing to do with how it was used. (*Ibid.*)

### iii. Brown's "Double Knowledge" Claim

Finally, Brown cryptically maintains there was no evidence that he *both* derived "support from therefrom [*sic*], knowing that Hall was a prostitute at the time," *and* that he also knew "he was being supported by the earnings of a prostitute." Brown appears to claim that the evidence did not show that Brown both knew Hall was a prostitute when he received money from her *and* that he knew that the money she gave him was from her prostitution efforts but not from elsewhere. In essence, Brown is claiming that the prosecution was required to show that any money Brown took from Hall was exclusively and only from her prostitution, and that none was from other sources, whether from her steak–house job, her "tutoring," or even her "hair–braiding," naked or otherwise. Thus, he argues that the offense requires proof that *all* the money Brown knowingly received from Hall came from prostitution, and that none might have come from another source.

To clearly state the issue is to reject it. Just as with Brown's erroneous claim that *all* of his support must come from Hall's prostitution — not just some of it — so too with his insistence on his knowing acceptance of the source of *every* dollar he took from her. That is not what the statute proscribes, and Brown offers no authority to suggest otherwise.

As discussed, the evidence here substantially established that Brown both knew that Hall was a prostitute *and* that he knowingly — indeed, encouragingly — took money from her for his own use. Based on the text messages, Hall's interview with Bailey, and even Hall's often fractured testimony, there is nothing here to suggest that Brown thought that *all* the money he took from Hall was from something other than her prostitution, her odd claims of mutually–naked hair–braiding sessions notwithstanding. Instead, the overwhelming evidence showed that Brown knew exactly where Hall's monies came from when he took them from her, as notably evidenced when on March 28 he tellingly encouraged her by saying, "Can't wait to really elevate with you and take our game to another level."

21.

Brown raises a related argument in his instructional error contention that we discuss below, but for purposes of a sufficiency of the evidence inquiry we find substantial evidence more than adequately supports Brown's pimping conviction.

**C. The Pandering Conviction**

Pandering is codified in section 266i. (*People v. Campbell* (2020) 51 Cal.App.5th 463, 485 (*Campbell*); *People v. Chatman* (2019) 30 Cal.App.5th 989, 993 (*Chatman*).) The section has six subdivisions, each of which defines a different way that the offense can be committed. (*Campbell, supra*, 51 Cal.App.5th at p. 485); see *People v. Lax* (1971) 20 Cal.App.3d 481, 486 [the six "do not state different offenses but merely define the different circumstances under which the crime of pandering may be committed"].)[13]

Unlike the related crime of pimping found in section 266h, pandering does not involve a defendant's deriving support from another person's prostitution. (*Campbell, supra*, 51 Cal.App.5th at p. 487.) Instead, the pandering statute is designed to discourage prostitution " 'by discouraging persons other than the prostitute from augmenting and expanding a prostitute's operation, or increasing the supply of available prostitutes.' " (*People v. Zambia* (2011) 51 Cal.4th 965, 973 (*Zambia*).) "[T]he intent and purpose … is to prohibit a person from encouraging a prostitute to work under his aegis *or that of someone else*, regardless whether the target being solicited is already a working prostitute." (*Id.* at p. 977, italics added.)

Here, Brown was charged and convicted under subdivision (a)(6) in an information that alleged he "willfully and unlawfully received or gave, or agreed to give or receive any money or thing of value *for* procuring, or attempting *to* procure another person for the purpose of prostitution[.]" (Italics added.) This subdivision requires that the defendant did something *in exchange for* procuring, or attempting to procure, another

---

[13] Prior to January 1, 1998, the six current subdivisions of section 266i were instead found in lettered subsections. Thus, relevant here, current section 266i, subdivision (a)(6) was then section 266i(f). (See Stats. 1997, ch. 818, § 3 (AB 1303).) No substantive changes were made to section 266i by these amendments and for clarity we may sometimes refer to both statutory incarnations.

person for the purpose of prostitution. In other words, *for* procuring, not *by* or *in* procuring. The pronoun "for" is unique to this subdivision, whereas in the other subdivisions where procure is found, the active verb "procures" is instead used. (See § 266i, subdivisions (a)(1), (a)(3), and (a)(5); note that subdivisions (a)(2) and (a)(4) do not use the word procure in any form.)

Because "procure" is not defined in section 266i, or elsewhere in the Penal Code, the parties focus their briefing on this word, and dispute whether or not it can also mean to "assist" someone in engaging in prostitution. However, in their analyses of section 266i, they largely miss the fact that subdivision (a)(6) is different from the other subdivisions, and it is this difference that dictates how we decide Brown's sufficiency claim. Phrased differently, the key here is the prosecution's charging choice of subdivision (a)(6) and whether substantial evidence shows that this particular subdivision was violated. Even though they duel over the meaning of "assist" and "procure," none of the authorities they cite is a subdivision (a)(6) case.

For example, in *Campbell* — a case the People extensively rely upon — the court stated that the term procure does mean " 'assisting, inducing, persuading, or encouraging' [another] to engage in prostitution." (*Campbell, supra*, 51 Cal.App.5th at p. 485.) However, the words "induce," "persuade," and "encourage" only appear in subdivisions (a)(2) and (a)(4), and neither subdivision uses the term procure. Moreover, in *Campbell* the defendant was charged only under subdivision (a)(1) [simple "procuring"], and the trial court also instructed on subdivisions (a)(2), and (a)(5). (*Id.* at p. 485, fn. 16.) In its analysis, the *Campbell* court discussed those two additional uncharged subsections, but there was no mention of subdivision (a)(6).[14] Similarly, our

[14] Other cases the parties have cited are similarly distinguishable. See, e.g., *People v. Montgomery* (1941) 47 Cal.App.2d 1, 12 (*Montgomery*), overruled on other grounds in *Zambia, supra,* 51 Cal.4th at p. 981 [defendant charged under today's subdivision (a)(3) by " 'procuring' a female as an inmate for a house of prostitution"]; *People v. Schultz* (1965) 238 Cal.App.2d 804, 811 [same]; *People v. Osuna* (1967) 251 Cal.App.2d 528,532–533, and cases cited [same]; *People v. Mathis* (1985)

Supreme Court's decision in *Zambia* was a subdivision (a)(2) case, and the issue was whether "any solicited 'person,' whether an active prostitute or not, may be the target of unlawful pandering," a question not relevant here. (*Zambia, supra,* 51 Cal.4th at pp. 977-978; *id.* at p. 981.)

*Chatman, supra,* provides an analytical starting point. In that case, the defendant "was convicted of pandering in violation of [subdivision (a)(1)], [but] not subdivision (a)(2)." (*Chatman, supra,* 30 Cal.App.5th at p. 993.) The court distinguished *Zambia* by observing that "the targeted language 'to become a prostitute' [in subdivision (a)(2)], while central to the analysis in *Zambia*, is not an element of the pandering offense with which defendant was charged and convicted. [Subdivision (a)(1)] requires only that a defendant '[p]rocures another person for the purpose of prostitution.' As a result, *Zambia's* extensive analysis of what it means to become a prostitute is inapplicable to a subdivision (a)(1) prosecution." (*Chatman, supra,* 30 Cal.App.5th at p. 995.)

So too here. The issue before us is whether there is substantial evidence showing that Brown received or gave, or agreed to give or receive, anything *for* procuring Hall under subdivision (a)(6). Thus, not only is *Zambia*'s analysis of what it means to "become" a prostitute inapplicable, so too is *Campbell*'s discussion of whether "assist" may be included in the meaning of "procure" as it applies to subdivisions (a)(1), (a)(2), or (a)(5).

This is not a mere semantic exercise. The gravamen of the subdivision (a)(6) offense is whether the defendant gave or *received* (or agreed to give or receive) something *in exchange for* procuring a prostitute, not whether the defendant may have *additionally* procured a prostitute in a manner that falls within the meaning of the other uncharged subdivisions of the statute.

---

173 Cal.App.3d 1251, 1255–1256 [today's subdivision (a)(2), by procuring with "promises, threats, violence or any device or scheme"].

In *People v. Bell* (1988) 201 Cal.App.3d 1396 (*Bell*), the court affirmed a conviction for solicitation to commit sexual assault where the defendant asked an undercover officer to "procure a girl six to nine years of age … to engage in sexual intercourse and mutual oral copulation." (*Id.* at p. 1398.) Significant here, the defendant was also convicted of pandering under section 266i(f) (current subdivision (a)(6)).

The defendant first claimed the conviction should be reversed because he did not give or agree to give anything of value for purposes of prostitution "because there was no mention of a fee to the child herself." (*Bell, supra,* 201 Cal.App.3d at p. 1400.) In rejecting the argument, the court noted that that wording of the statute "is broad enough to encompass the situation where … one adult offers to pay money *to another* to induce a young child to engage in sexual activities. Such an interpretation clearly promotes the statute's goal, which, … is 'to discourage prostitution by discouraging persons other than the prostitute from augmenting and expanding a prostitute's operation, or increasing the supply of available prostitutes.' " (*Ibid.*, italics added.)

Although *Bell* is distinguishable on its facts, it is noteworthy because of the contemplated involvement of a third party — one person paid (or received) money to (or from) another person *in order to* induce yet another person — the prostitute — to engage in prostitution. This is the only logical way to construe subdivision (a)(6)'s theory of pandering. This is confirmed when we also see the *Zambia* court referring to one of the goals of section 266i as a whole is to prohibit a person from "encouraging a prostitute to work under his aegis *or that of someone else*," the latter of which is exactly what subdivision (a)(6) proscribes. (*Zambia, supra,* 51 Cal.4th at p. 977, italics added.)

Especially instructive here is *People v. Charles* (1963) 218 Cal.App.2d 812 (*Charles*), a case neither party cites. There the defendants drove two cocktail waitresses home from a bar where they worked, using the ride as an opportunity to invite them to work for a house of prostitution. They continued to urge the waitresses to accept the offer by later visiting them at their apartment and in five telephone conversations. The women contacted police, who arranged to be present in hiding at a meeting between the waitresses and the defendants. After the police overheard the defendants give extensive

25.

details of the proposed arrangement, they were arrested. (*Id.* at pp. 816–817.) The defendants were convicted in an information that charged them with the "crime of Pandering (P.C.266i(f))" by "attempt[ing] to procure a female person to become an inmate in a house of ill–fame within the State of California[.]" (*Charles, supra,* at p. 819.)

Similar to today's subdivision (a)(6), at the time section 266i(f) provided that a person who "receives or gives, or agrees to receive or give, any money or thing of value for procuring, or attempting to procure, any female person to become an inmate of a house of ill-fame … is guilty of pandering[.]" (See *Charles, supra*, 218 Cal.App.2d at p. 816.)

However, despite the prosecution's inclusion in the information of this parenthetical reference to subsection (f), the charging *language* that was used, and under which the defendants were convicted, instead tracked subsections (a) and (b) — current subdivisions (a)(1) and (a)(2) — which then provided that "[a]ny person who: (a) procures a female inmate for a house of prostitution; or (b) by promises, threats, violence, or by any device or scheme, causes, induces, persuades or encourages a female person to become an inmate of a house of prostitution" is guilty of pandering. (*Charles, supra,* 218 Cal.App.2d at p. 816.)

On appeal the defendants first contended that the evidence was insufficient to establish attempted pandering. They argued the evidence only showed intention and mere preparation, but it did not show the existence of a house of prostitution or the placement of the women inside it. The *Charles* court disagreed and found sufficient evidence of an attempt, with specific intent and direct unequivocal acts towards its completion, despite it being frustrated by the fact that the women refused to work as prostitutes and that the police intervened. (*Charles, supra,* 218 Cal.App.2d at p. 816.)

Relevant here, the *Charles* defendants also claimed that because of the parenthetical reference to subsection (f) in the information, the evidence had failed to establish the elements of that particular theory of pandering. (*Charles, supra,* 218 Cal.App.2d at p. 818.) The People weakly responded by arguing that the "conduct

described in clause (f)" *included* the conduct described in subsection (a) and (b), but the *Charles* court found "this interpretation of the statute [to be] without merit." (*Ibid.*)

Instead, the court found that subsection (f) was "directed to the receipt or payment of, or agreement to receive or pay, money *for* 'procuring' or 'attempting to procure,' and not *in* 'procuring' or 'attempting to procure'," and that these two distinct prepositions made all the difference. (*Charles, supra,* 218 Cal.App.2d at p. 818, original italics.) Thus, subsection (f) was "related to a transaction involving the receipt as well as the payment of money *for* procuring a female person to become an inmate of a house of ill–fame, which is without the scope of a transaction between the procurer and the female person who is the subject of such procurement[] and [it]contemplates, in substance, the employment of a person *for* 'procuring' or 'attempting to procure.' " (*Charles, supra,* 218 Cal.App.2d at p. 818, italics added.) In other words, the underlying theory of that subsection necessitated a third person or intermediary who was to gain something *in exchange for* procuring someone else for prostitution purposes.

The *Charles* court ultimately rejected the defendants' claim and found that the *language* of the pleadings — despite the parenthetical reference to subsection (f) — had adequately described the defendants' conduct under subsections (a) and (b). It concluded that the charging language was controlling, not the parenthetical reference, and that the evidence supported an attempted pandering conviction within the meaning of subsections (a) and (b): "[T]he reference therein to clause (f) of the subject code section did not negative that charge, and may be disregarded as immaterial." (*Charles, supra,* 218 Cal.App.2d at p. 818.)

Here, of course, we do not have a situation where a stray parenthetical pleading anomaly confused the issue as happened in *Charles*. Rather, the pleadings in this matter do not merely refer to subdivision (a)(6) parenthetically; they instead quote it in full, and

the jury instruction the trial court gave specifically targeted that subdivision alone and its language.[15]

Thus, the *Charles* court's rejection of the defendants' sufficiency of the evidence claim in that case is not only unavailable here, it actually implies that Brown's conviction under subdivision (a)(6) is unsupported by the evidence. There is no evidence Brown received anything *in order to* procure Hall, i.e., *for* procuring her as the *Charles* court put it. Instead, the evidence shows that anything Brown received for his efforts was *from* Hall, in his role as her *pimp*, not for procuring her on someone else's behalf to engage her in prostitution. Brown received nothing *for* procuring Hall within the meaning of subdivision (a)(6).

Moreover, there is no third party in the mix here. Hall could not have procured *herself* under subdivision (a)(6), by *giving* Brown her own money *in order to* have him then procure her *for* her own continuing prostitution activities. (See *Montgomery, supra,* 47 Cal.App.2d at p. 11 [one cannot procure themself]; cf. *People v. Brown* (1923) 61 Cal.App. 748, 751, 753 ["It involves an absurdity, contrary to good sense," to say that the procured woman "induced, persuaded and encouraged" herself.].) Nor could Brown have procured Hall under this subdivision by receiving money from *himself* in order to induce Hall to continue her prostitution activity. Such a possibility is logically circular, and it would mean that pimps are simultaneously panderers under subdivision (a)(6), rendering section 266h superfluous.

By choosing subdivision (a)(6) as its pandering theory, the prosecution elected to narrowly define the charge. It matters not whether the prosecution *could* have proceeded under a different subdivision of section 266i — perhaps under subdivisions (a)(1) or (a)(2) — nor whether the evidence *could* have supported them. Our sufficiency review is

---

[15] "[Brown] is charged in Count 2 with pandering, in violation of Penal Code Section 266(i). To prove that the defendant is guilty of pandering, the People must prove the following: [¶] 1. The defendant *received* money, or something of value, *in exchange for procuring* [Hall] to be a prostitute; [¶] AND [¶] 2. The defendant intended to influence [Hall] to be a prostitute[.]" (CALCRIM No. 1151, italics added.)

28.

circumscribed by the prosecution's theory of its case and, unlike *Charles,* on the unambiguous charging language and the jury instruction given.

We review for substantial evidence. Under this standard, our power " 'begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination.' " (*People v. Superior Court (Jones)* (1998) 18 Cal.4th 667, 681, italics omitted.) Here, it is lacking. The pandering conviction under section 266i, subdivision (a)(6) is unsupported by the evidence before us and must therefore be reversed.

## II. The Jury Instructions

Brown next contends the judgment should be reversed because the trial court prejudicially erred with three of its jury instructions. Because we are reversing Brown's pandering conviction on other grounds, we need only address the two claims he makes regarding his pimping conviction.

### A. Standard of Review and Legal Background

"We review claims of instructional error de novo. [Citation.] We independently review the instruction's language and evaluate whether it accurately states the law. [Citation.] Considering the entire record and the instructions as a whole, we must determine whether there is a 'reasonable likelihood' that the trial court's instructions caused the jury to misapply the law." (*People v. Virgen* (2025) 110 Cal.App.5th 440, 449–450 (*Virgen*).) " 'Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions.' " (*People v. Thomas* (2023) 14 Cal.5th 327, 382.) We do not review only parts of an instruction, or an instruction in isolation, and instead view the entirety of the instructions as given. (*Ibid.*) If reasonably possible, we interpret an instruction in a manner that supports the judgment, as opposed to defeating it. (*People v. Mani* (2022) 74 Cal.App.5th 343, 377.)

### B. The Mens Rea of Pimping and CALCRIM Nos. 252 and 1150

Brown claims the trial court failed to adequately instruct the jury with the mens rea of pimping. Specifically, similar to the argument he raised in his sufficiency attack we rejected above, he maintains that the standard instructions are flawed because they fail

29.

to require the jury to find that Brown *knew* that he received support "from money earned from acts of prostitution." In other words, Brown argues that although the jury was told that Brown had to have known Hall was a prostitute and that he received support from her, it was not told it also had to find that Brown knew that the support he received from her was derived from her prostitution.

### i. Background

The trial court instructed the jury with CALCRIM No. 1150, which required the People to prove that: "1. The defendant knew that [Hall] was a prostitute; [¶] AND [¶] 2. The money that [Hall] earned as a prostitute supported defendant, in whole or in part." The jury was also instructed with CALCRIM No. 252, which in part stated that: "The specific mental state required for the crime of Pimping in Count 1 is knowledge that [Hall] was a prostitute."

At the jury instruction conference, the trial court stated that it intended to instruct on the pimping count with these standard instructions. Defense counsel offered no objection, nor did he request a modification or any additional instructions pertaining to this count.

### ii. Forfeiture

Generally, " '[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' " (*People v. Hin* (2025) 17 Cal.5th 401, 483; *People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012.) Similarly, a party may not seek appellate review based on an instruction they accepted. (*People v. Mason* (2013) 218 Cal.App.4th 818, 823 [" '[A] party who … acquiesces in … a particular jury instruction cannot appeal the giving of that instruction.' "].) In other words, because Brown's current complaint about the shortcomings of CALCRIM Nos. 252 and 1150 was not expressed in the trial court, it may be disregarded without further discussion.

Nonetheless, forfeiture will not apply if the allegedly infirm instruction so "affected the substantial rights of [the] defendant," that "the instruction result[ed] in a

30.

miscarriage of justice, making it reasonably probable that absent the erroneous instruction defendant would have obtained a more favorable result." (*Campbell, supra,* 51 Cal.App.5th at p. 499; see § 1259.) Thus, we may reach the merits of Brown's instructional challenge but only if the alleged error affected his " 'substantial rights.' " (*People v. Hardy* (2018) 5 Cal.5th 56, 91.)

As we explain more fully below, there is no reasonable probability that Brown would have fared better had the court given versions of CALCRIM Nos. 252 and 1150 that included what Brown argues were necessary. The evidence overwhelmingly shows that Brown knew Hall was a prostitute, and that her earnings came from her prostitution. Moreover, there is no doubt that Brown took them from her knowing exactly whence they came. Because his substantial rights were not affected by the standard instruction, his lack of objection to and acquiescence in that instruction forfeits his challenge.

*iii. The Merits*

Even were we to consider the claim on the merits we would reach the same result. Section 266h does not contain a requirement that a person deriving support from a known prostitute must know the source of that support. However, it has been discussed by the courts. (See, e.g., *Grant, supra*, 195 Cal.App.4th at p. 115.) Similarly, because it tracks the statute almost verbatim, CALCRIM No. 1150 also does not voice such a requirement, nor does CALCRIM No. 252.

Normally, " ' "[i]nstructions in the language of an applicable statute are properly given." ' " (*Metcalf v. County of San Joaquin* (2008) 42 Cal.4th 1121, 1131, italics omitted.) However, even though section 266h does not say anything relevant to Brown's extra mens rea claim, Brown does not attack the statute itself. Rather, he makes a derivative *instructional* error claim, insisting that the CALCRIMs are fundamentally flawed because they lack any mention of this additional non–statutory knowledge requirement, the statute notwithstanding.

In doing so, Brown again relies on *Grant, supra.* As discussed above, however, that case involved a *facial* constitutional overbreadth challenge to section 266h, on the grounds it: (1) deprives a defendant "of his right of association by prohibiting

cohabitation with a known prostitute;" and (2) outlaws " 'receiving any amount of money, for any reason, from a person they know to be a prostitute, regardless of whether [the defendant] knows the source of the funds' or has 'the purpose to perpetuate the prostitution' " (*Grant, supra,* 195 Cal.App.4th at p. 112.) Thus, the case had nothing to do with factual sufficiency, the elements of the offense, jury instructions, or even an *as-applied* constitutional challenge to Grant's conviction.

The court concluded "the statutory prohibition of deriving support from the earnings of a known prostitute is related to a proper legislative goal, and hence, is constitutional." (*Grant, supra,* 195 Cal.App.4th at p. 114.) The "Legislature may well have reasoned that (a) a person deriving support from the earnings of a known prostitute would know or would reasonably be expected to know the source of the funds [citation]; and (b) criminal liability could be avoided only *if a defendant demonstrated* either a lack of knowledge that the person was a prostitute, the funds were not derived from acts of prostitution, or the funds were not being used for support and maintenance in whole or in part." (*Ibid.*, italics added.)[16] In fact, the *Grant* court referenced *State v. Cashaw* (1971) 4 Wn.App. 243, a constitutional overbreadth challenge to a Washington pimping statute, where the court found that the offense prohibiting living with or accepting earnings of prostitute did not require the prosecution to prove the defendant's knowledge of prostitute's activities as a prostitute; rather, it characterized lack of such knowledge as an *affirmative defense*. (*Id.* at pp. 251–253.)

*Grant*'s rejection of a facial overbreadth challenge cannot be read so out of context as to have judicially created a new mens rea *element* for the offense of pimping, let alone an obligation for the standard jury instructions to correspondingly include one.

Indeed, the jury in *Grant* had been given an instruction almost identical to that

---

[16] Cf. *People v. Fuski* (1920) 49 Cal.App. 4, 7 [failure of indictment charging pimping to include a specific allegation that defendant knew money for support was derived from acts of prostitution was not fatal defect as "no one would have any difficulty in understanding from the indictment as a whole that such was the intended charge of the pleader"].)

32.

given here; one that also failed to include a requirement regarding knowledge of the source of the prostitute's support, and the court found no error.[17] Instead, the court concluded that, "[t]he jury here was instructed using *the language in section 266h(a), without objection.* [Fn.] Additionally, *the evidence* in this case was sufficient to allow the jury to conclude beyond a reasonable doubt that [defendant] knew [the woman] was a prostitute, 'her earnings in question were secured from her prostitution,' and [defendant] 'derived support, in whole or in part, from such earnings *knowing his receipts were derived from her prostitution.*' [Citation.] Accordingly, we affirm [defendant's] conviction for pimping." (*Grant, supra,* 195 Cal.App.4th at p. 117, italics added.) In other words, the *evidence* in *Grant* still supported a *factual* determination that the defendant knew his support was derived from prostitution, even though the jury was never instructed it had to so find.

So too here. We conclude, just as the *Grant* court did, that the jury was instructed with the language of the statute without objection, and that the evidence here was more than sufficient to establish that Brown knew the money he had been taking from Hall for his support was derived from her prostitution. Indeed, the evidence here showed even more than that, because Brown actively and repeatedly exploited Hall over time to ensure she would continue to support him.

Therefore, as noted above, even if the modified instructions that Brown now insists were necessary had been given, their omission was harmless because there is no reasonable probability that Brown would have otherwise obtained a more favorable result. (*Campbell, supra,* 51 Cal.App.5th at p. 499; § 1259.)

---

[17] The instruction given in *Grant* court was identical to CALCRIM No. 1150, although it was not cited: "To prove that the defendant is guilty of pimping, the People must prove that: [¶] 1. The defendant knew that [the woman] was a prostitute; [¶] AND [¶] 2. The money that [the woman] earned as a prostitute supported defendant, in whole or in part." (*Grant, supra,* 195 Cal.App.4th at p. 117, fn. 5.)

## C. Unanimity

Brown next argues the trial court prejudicially erred by failing to provide a sua sponte unanimity instruction for the pimping count.

When assessing a claim of a *failure* to instruct, "[w]hether or not the trial court should have given a 'particular instruction in any particular case entails the resolution of a mixed question of law and fact,' which is 'predominately legal' " (*People v. Hernandez* (2013) 217 Cal.App.4th 559, 568 (*Hernandez*)), which we review de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1212; *Virgen, supra,* 110 Cal.App.5th at pp. 449–450.)[18]

Generally, a trial court has a sua sponte duty to give a unanimity instruction only if the prosecution presents evidence of multiple acts to prove a single count. (*People v. Russo* (2001) 25 Cal.4th 1124, 1132.) "A requirement of jury unanimity typically applies to acts that *could have been charged as separate offenses*. [Citations.] A unanimity instruction is required only if the jurors could otherwise disagree which act a defendant committed and yet convict him of the crime charged." (*People v. Maury* (2003) 30 Cal.4th 342, 423, italics added.) Conversely, no such duty arises if the offense comprises a "continuous course of conduct," where individual "acts were so closely connected in time as to form part of one transaction." (*Hernandez, supra,* 217 Cal.App.4th at p. 572.)

The continuous conduct exception to the unanimity requirement is not unlimited, but it does apply where the statute " ' "contemplates a continuous course of conduct of a series of acts over a period of time," including pimping and pandering.' " (*Leonard, supra,* 228 Cal.App.4th at p. 491.) Both offenses "have been held to be crimes of a continuous ongoing nature and are therefore not subject to the requirement that the jury must agree on the specific act or acts constituting the offense." (*People v. Dell* (1991) 232 Cal.App.3d 248, 265–266 (*Dell*); see *Lewis, supra,* 77 Cal.App.3d at pp. 460–462

---

[18] The People argue Brown has forfeited the claim by failing to raise it below. However, if the evidence justified a unanimity instruction and the prosecution did not elect which of multiple potential acts it was relying upon, the trial court is obligated to give such an instruction sua sponte. (*People v Riel* (2000) 22 Cal.4th 1153, 1199 (*Riel*).)

[pimping by living or deriving support from prostitute's earnings can be an ongoing continuing offense]; cf. *People v. White* (1979) 89 Cal.App.3d 143, 151 (*White*) [pandering]; *Leonard, supra,* 228 Cal.App.4th at p. 491 [same].)

At core, both offenses are similarly directed. Under the pimping statute, "the offense is one ongoing offense — a defendant deriving support or maintenance from the earnings of a prostitute. [Citation.] [Pandering] is similar to [pimping] since, once the female is procured … the one offense becomes ongoing as long as the female plies her trade[.]" (*White, supra,* 89 Cal.App.3d at p. 151.) Similarly, both statutes are fundamentally " 'designed to discourage prostitution by discouraging persons other than the prostitute from augmenting and expanding a prostitute's operation, or increasing the supply of available prostitutes.' " (*Ibid.*, quoting *People v. Hashimoto* (1976) 54 Cal.App.3d 862, 867.) By their very nature, these offenses are not serially discrete events, but instead involve a sex worker being exploited for extended periods of time for as long as the pimp can continue to harvest the proceeds of prostitution. This is exactly what the evidence shows Brown did by exploiting Hall from at least March 24 to April 23 of 2022. Phrased differently, Brown was still Hall's pimp on April 23 as he waited nearby after dropping her off at the Holiday Inn, where he was fully expecting to *continue* to knowingly derive support from her prostitution.

The trial court did not err by failing to provide a unanimity instruction on the pimping count because the evidence did not justify one. (*Lewis, supra*, 77 Cal.App.3d at pp. 460–462; *Dell, supra,* 232 Cal.App.3d at p. 266.) Because the trial court did not err, we need not consider Brown's additional arguments regarding prejudice. (*Riel, supra,* 22 Cal.4th at p. 1199.)

## III. Ineffective Assistance of Counsel (IAC)

Lastly, Brown contends the judgment should be reversed because trial counsel was constitutionally ineffective by failing to object to two portions of Detective Bailey's testimony: (1) Bailey's opinion as to whether Brown was "acting as a pimp"; and (2) Bailey's use of allegedly improper gender–based stereotyping in his explanation to the jury of how the sex trafficking trade is often conducted.

In general, " ' " 'questions relating to the admissibility of evidence will not be reviewed on appeal in the absence of a specific and timely objection in the trial court on the ground sought to be urged on appeal.' " ' [Citations.] ' "The objection requirement is necessary in criminal cases because a 'contrary rule would deprive the People of the opportunity to cure the defect at trial and would "permit the defendant to gamble on an acquittal at his trial secure in the knowledge that a conviction would be reversed on appeal." ' " ' " (*Oyler, supra*, 17 Cal.5th at p. 831.) Thus, absent any objection to the prosecutor's questions or to those portions of Bailey's testimony Brown now deems improper, he has "failed to preserve any evidentiary challenges for appeal." (*Id.* at p. 834, citing *People v. Freeman* (1994) 8 Cal.4th 450, 490 ["The trial court … has no sua sponte duty to exclude evidence or to remedy misconduct"].) Consequently, any claim that these portions of Bailey's testimony were wrongly admitted has been forfeited.

Acknowledging as much, Brown instead posits the *de rigueur* fall–back claim that, forfeiture aside, the judgment must still be reversed because trial counsel was constitutionally ineffective.

### A. Legal Background

To prevail on an IAC claim, a defendant bears the burden of *proving* it. Such proof must satisfy two distinct but equally crucial components: "A [defendant] must show that counsel's performance was deficient, *and* that the deficiency prejudiced the defense." (*Wiggins v. Smith* (2003) 539 U.S. 510, 521 (*Wiggins*), italics added; *Buck v. Davis* (2017) 580 U.S. 100, 118 (*Buck*); *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) Both components of this test "are mixed questions of law and fact subject to our independent review." (*In re Gay* (2020) 8 Cal.5th 1059, 1073 (*Gay*).)

As to the first component, the test is not satisfied by asserting formulaic or conclusory incantations applied in hindsight. (Cf. *Buck, supra,* 580 U.S. at p 118 [the first prong "sets a high bar'"].) Moreover, the standard is one of "reasonableness," and one which is viewed from trial counsel's perspective at the time of the challenged act or omission. (*Burger v. Kemp* (1987) 483 U.S. 776, 789; *Strickland, supra*, 466 U.S. at pp. 688–690; *People v. Arredondo* (2019) 8 Cal.5th 694, 711.)

Correspondingly, it is presumed that trial counsel made all significant decisions in the exercise of their reasonable professional judgment. (*Cullen v. Pinholster* (2011) 563 U.S. 170, 196.) Thus, "*absence of evidence* [of deficiency] cannot overcome the 'strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance.' " (*Burt v. Titlow* (2013) 571 U.S. 12, 23 (*Burt*), italics added; cf. *Gay, supra*, 8 Cal.5th at p. 1073 [the question is "whether *any reasonably competent counsel* would have done as counsel did" (italics added)]; see *Harrington v. Richter* (2011) 562 U.S. 86, 105 (*Harrington*) ["standard for judging counsel's representation is a most deferential one"]; *Bell v. Cone* (2002) 535 U.S. 685, 702 [same].)

At the same time, "[t]here are countless ways to provide effective assistance [and] [e]ven the best criminal defense attorneys would not defend a particular client in the same way." (*Strickland, supra*, 466 U.S. at p. 689.) Rarely is there only one reasonable strategy for a defense attorney to adopt when representing a client in a criminal case. That other strategies might exist, or might appear in hindsight to have potentially stood a better chance at success, does not make the strategies trial counsel ultimately employed unreasonable nor show that counsel's performance was constitutionally deficient. (See *Maryland v. Kulbicki* (2015) 577 U.S. 1, 4; *People v. Jennings* (1991) 53 Cal.3d 334, 379–380 (*Jennings*).)

Finally, but no less importantly, for Brown "[t]o establish deficient performance, [he] must *demonstrate* that counsel's representation 'fell below an *objective* standard of reasonableness,' [citation]" as measured by " '*prevailing professional norms*.' " (*Wiggins, supra*, 539 U.S. at p. 521, italics added; see *People v. Simmons* (2023) 96 Cal.App.5th 323, 336.)

Because these considerations are primarily fact–based, often requiring an evidentiary hearing, they are more properly brought on habeas corpus, not direct appeal. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266–267; *People v. Romero and Self* (2015) 62 Cal.4th 1, 25; cf. *People v. Cunningham* (2001) 25 Cal.4th 926, 1003 [on direct appeal, "deficient performance [must be] based upon the four corners of the record"].)

Under the second component of the IAC test, a defendant must prove prejudice "that is a ' "demonstrable reality," not simply speculation.' [Citations.] Prejudice requires 'a reasonable probability that a more favorable outcome would have resulted …, i.e., a probability sufficient to undermine confidence in the outcome.' " (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.) "It is not enough for the defendant to show that the errors had some *conceivable effect* on the outcome of the proceeding." (*Strickland, supra*, 466 U.S. at p. 693–694, italics added; see *Harrington, supra,* 562 U.S. at p. 112 [a probability of a different result "must be substantial, not just conceivable"]; cf. *People v. Thompson* (2022) 83 Cal.App.5th 69, 92 [if a "defendant's prejudice contention is essentially speculative, it must be rejected."].)

**B. Analysis**

As noted, Brown's IAC claim is two-fold, based on counsel's failure to object to: (1) Bailey's opinion that Brown was a pimp; and (2) Bailey's gender–based references in his descriptions of how some human trafficking works. We discuss them separately.

*i. Bailey's Opinion*

After Bailey had testified about his qualifications, the general background of the sex trafficking trade, his interview with Hall at the Holiday Inn, and the text messages, his testimony concluded with the following:

> "[Prosecutor:] Detective Bailey, based on your background, training, and experience, your review of the evidence in this case, did you form an opinion about whether the defendant was acting as a pimp towards Ms. Hall?
>
> "[Bailey:] Yes.
>
> "[Prosecutor:] What is that opinion?
>
> "[Bailey:] It's that he was. I believe the evidence showed that he was well aware that she performed sex dates for money. I believe it shows he was benefitting from it, whether it was her handing him the money directly, having a pocket full of money, paying for his hotels, paying for his gas, paying for his food. [¶] I believe it also shows he was assisting her, by driving her, by leaving the room, and providing protection while she performed the sex dates, and also motivating her by saying things like 'That's right, baby,' when she tells him she made a certain

38.

amount of money. [¶] All those things combined show he was benefitting and procuring her … commercial sex work."

No objection was made to the prosecutor's questions or to Bailey's responses. Rather, on cross–examination defense counsel pointedly asked Bailey, "[Y]ou made a conclusion that you believed that Mr. Brown was acting as Ms. Hall's pimp, isn't that true?" Bailey said he did. Counsel then asked, "And when you made that conclusion, that was your opinion, not a legal conclusion, is that correct?" Bailey replied, "Opinion, based off [*sic*] the evidence I've seen."

The prosecutor's question in this instance was improper. In this particular case, the witness's opinion testimony on ultimate conclusions should have been couched in hypothetical questions, based on a factual scenario that is assumed as true, but not on the facts of the case. Inferential conclusions to be made from the actual facts are for the fact–finder to make, not the witnesses. (See *Leonard*, *supra*, 228 Cal.App.4th at p. 493.) As a result, out of the 55 pages of Bailey's testimony, his three paragraph response to the prosecutor's improper question was inadmissible and, had an objection been made, it should have been excluded.[19] !(RT838-93)

On direct appeal, a reviewing court may find deficient performance only if: (1) the record *affirmatively discloses* counsel had no rational tactical purpose for the challenged act or omission; (2) counsel was asked for a reason and failed to provide one; or (3) there simply could be no satisfactory explanation. (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165.) If trial counsel's tactics or the strategic reasons for their now–challenged trial court decisions do not appear on the *face of the record*, we may not find IAC unless there could be no conceivable reason for such acts or omissions. (*Ibid.*)

---

[19] For the first time on appeal, Brown attempts to challenge Bailey's qualifications and expertise, but it comes too late as it was forfeited. In any event, "[i]t is 'not the role of this court to redetermine the credibility of experts or to reweigh the relative strength of their conclusions.' " (*People v. Kirvin* (2014) 231 Cal.App.4th 1507, 1514; cf. *People v. Ramirez* (2022) 13 Cal.5th 997, 1118 [" ' "We do not reweigh evidence or reevaluate a witness's credibility" ' "].)

As a result, "[r]arely is [IAC] established on [direct] appeal since the record usually sheds no light on counsel's reasons for action or inaction." (*People v. Woodruff* (2018) 5 Cal.5th 697, 736.) Similarly, because " 'deciding whether to object is inherently tactical, … the failure to object will rarely establish ineffective assistance.' " (*People v. Carrasco* (2014) 59 Cal.4th 924, 985.)

As for the prosecutor's improperly framed question to Bailey, therefore, "the mere fact that counsel, had he chosen another path, 'might' have convinced the court to issue a favorable evidentiary ruling, is not enough to carry [the] defendant's burden on demonstrating [incompetence][.]" (*Jennings, supra,* 53 Cal.3d at p. 379.) "[C]ompetent counsel may often choose to forgo even a valid objection. '[I]n the heat of a trial, defense counsel is best able to determine proper tactics in the light of the jury's apparent reaction to the proceedings. The choice of when to object is inherently a matter of trial tactics not ordinarily reviewable on appeal.' " (*Riel, supra,* 22 Cal.4th at p. 1197 ["[e]ffective attorneys do not always make an objection merely because it might be successful[.]"]; cf. *People v. Seumanu* (2015) 61 Cal.4th 1293, 1312 ["a case in which the mere failure to object would rise to such a level as to implicate one's state and federal constitutional right to the effective assistance of counsel would be an unusual one"].)

Here trial counsel might have had legitimate tactical reasons for not objecting. He may have realized that even after an objection, the prosecutor would have simply rephrased his question in such a way as to be properly posed as a hypothetical, and then reiterated at length all the evidence adduced over the previous days of trial in the form of "hypothetical" facts that closely mirrored the current case before then formally asking Bailey his opinion. Bailey would have expressed his opinion properly but with fresh reminders to the jury of all the previous trial testimony and evidence in a nice pre–packaged summary that constituted a final punctuation to his testimony.

Likewise, trial counsel may have realized that the only effective way to minimize Bailey's opinion would be to let it stand in its three–paragraph conclusory form, and then on cross–examination deliberately get Bailey to admit that it was a mere opinion, and not a legal conclusion. (See *People v. Harris* (2008) 43 Cal.4th 1269, 1290 ["counsel could

also have decided that objecting would focus the jury's attention … in ways that would not be helpful to the defense"]; cf. *People v. Ghent* (1987) 43 Cal.3d 739, 773 [although defense counsel failed to object to the prosecutor's personal opinion regarding the appropriateness of the death penalty, IAC was not shown because "[c]ounsel may well have tactically assumed that an objection or request for admonition would simply draw closer attention to the prosecutor's isolated comments"]).)

Thus, "[o]n this record, we cannot say 'there simply could be no satisfactory explanation' for defense counsel's failure to object and [Brown's] claim of ineffective assistance would be better pursued in a habeas corpus proceeding." (*People v. Barrett* (2025) 17 Cal.5th 897, 1020 (*Barrett*).) As such, Brown has failed to meet his burden of showing IAC at the first hurdle, and we need not move on to the second.

*ii. Alleged Gender Bias in Bailey's Testimony*

Brown's next IAC claim is based on portions of Bailey's testimony that Brown now claims were impermissible gender–based presumptions regarding males and the pimping and pandering livelihood, and because trial counsel failed to object to this supposedly prejudicial gender–bias, Brown concludes that trial counsel was constitutionally ineffective.

We first note that, factually, Bailey's testimony was not wholly gender–based. His testimony was most often neutrally couched in terms of the exploitation of sex workers, and the exploiter and the exploited, not on gender; indeed, he testified the task force's mission was to concentrate on the exploitation of sex workers, with no mention made of the gender of its targets. Nothing in Bailey's testimony suggests that had the gender roles been reversed, or with same–sex individuals, the task force's actions would have been different or that Bailey's opinions or conclusions would have varied.

To support this claim, Brown points to a part of Bailey's testimony where he argues that Bailey "opined [that] when a 'male' drives a commercial sex worker to a date, he is presumed to be her 'sexual exploiter,' " This misstates Bailey's testimony and glosses over its context.

41.

While Bailey was explaining the general "pimping and prostitution culture," he was asked whether there was any "significance to a male driving a [female] prostitute to a date?" Responding to this background question, Bailey said that "typically" a female prostitute "is not allowed to have a relationship with" any male who is not a sexual exploiter or a male family member. Moreover, in his experience as the lead investigator on over two dozen cases, and assisting with numerous others, never once had he seen a female prostitute "being dropped off at a date by a male who [was] not her sexual exploiter, or on a couple occasions, an Uber driver. But it's just not allowed in the commercial sex trade." Bailey "presumed" nothing; he testified to his personal experience as informed by his background and training regarding the "culture" of the commercial sex trade, not from any gender–based presuppositions.

Brown also claims gender–based error when Bailey was *asked* to explain the term "boyfriend pimp" when he was describing the sexual exploitation culture:

> "So boyfriend pimp is — in today's day and age, it's the most common version of pimp or sexual exploiter. It's not like you see in the movies or back in the 80s where there's one guy with several girls. [¶] A lot of times now, it's a commercial sex worker who has a boyfriend who, over time, grooms them into being just a commercial sex worker who is making money for them, for their way of life, their food, their hotels, their rent, whatever it is they need. And [the sex worker] also refer[s] to them as their boyfriend. When they're done working, they are still together doing things."

Again, this testimony was elicited when the prosecutor was establishing the general background of the trade as reflected in a term of art. Moreover, it was only in his foundational testimony, and before he was then asked to move on and discuss the evidence in the *current case*.

We find *People v. Wilson* (2025) 111 Cal.App.5th 1020 (*Wilson*) instructive. *Wilson* involved an IAC claim based on defense counsel's failure to object to the prosecutor's references to the term "gorilla pimp" during closing argument. (*Id.* at pp. 1025, 1030.)

The court noted the common use of such terms as "gorilla pimp," "finesse pimp," and "Romeo pimp," in sex trafficking cases, the latter being analogous to the "boyfriend

pimp" term Bailey used here, not the Shakesperean protagonist. (*Wilson, supra,* 111 Cal.App.5th at pp. 1033–1034.) "Sex trafficking has its own terminology that is unfamiliar to persons who are not engaged in the commercial sex business." (*Id.* at p. 1024.) Thus, " 'expert opinion on human trafficking and the sex worker subculture can assist the trier of fact on subjects not within an ordinary juror's understanding or experience. [Citations.] Not only are jurors generally unfamiliar with the realities of human trafficking, [citation], but a juror's only exposure to this subject may be confined to brief references gleaned from popular media outlets or fictionalized accounts. [Citation.] This only underscores the importance of expert testimony to aid the juror in understanding the complexities surrounding human trafficking and the sex worker subculture in today's society.' [Citation.] 'Based on … [the] expert testimony, the jury … could better understand critical issues in the case that might have confused jurors unfamiliar with the patterns and penchants of sex workers.' " (*Id.* at pp. 1033–1034; and see cases cited.) The court further observed that the term had been used by witnesses in the case as well, and found it "was relevant because it educated the jury as to the different techniques used by pimps to recruit and control prostitutes." (*Wilson, supra,* 111 Cal.App.5th at p. 1034.) So too here with the term "boyfriend pimp."

Brown asserts Bailey's testimony in this regard was objectionable, but he does not explain on what grounds other than an amorphous reference to "eliminating gender bias from the courtroom."[20] Nor does he provide any authority to suggest that expert testimony explaining the various business models of the human trafficking sub–culture would be inadmissible unless it were somehow "de-genderized," to coin a term.

In any event, the question before us here is whether trial counsel was constitutionally ineffective for not objecting to these background aspects of Bailey's

---

[20] *Wilson* involved a Black defendant and the allegedly racially–charged term "gorilla pimp," and whether trial counsel's failure to object to the term constituted IAC as a matter of law because it violated the Racial Justice Act (See § 745). (*Wilson, supra,* 111 Cal.App.5th at p. 1025.) Brown does not provide any similar gender–based authority from which to base his claim.

testimony. It is not the more speculative doctrinal question of whether evidence of gender–based " 'romantic paternalism' " (as Brown terms it) is inadmissible and was therefore objectionable. More importantly, Brown has not shown that was in fact what Bailey's testimony implied. Instead, he begs the question by simply asserting it was, and then proceeds to fault trial counsel's performance.

Therein lies the fundamental problem. Not only does Brown presume that his newly–minted evidentiary objection has merit, he also assumes an additional premise as true that is again not *shown* on the appellate record. Brown presupposes that constitutionally competent counsel would have objected to any aspects of Bailey's testimony that were not hygienically gender–neutral. In doing so, Brown puts the proverbial cart before the horse by founding his IAC claim on the merits of an underlying substantive issue of gender–bias — something perhaps more appropriate to prong two prejudice analysis — without having initially established the first component of the IAC test. Thus, just as with Brown's first IAC claim, Brown simply asserts prong one deficiency and then quickly moves on to his prong two arguments.

We reiterate that, "[t]o establish deficient performance, a [defendant] must *demonstrate* that counsel's representation 'fell below an *objective* standard of reasonableness,' [citation]" *as measured by* " 'prevailing professional norms.' " (*Wiggins, supra*, 539 U.S. at p. 521, italics added.) Here there is no *evidence* of any "prevailing professional norms" showing that constitutionally adequate counsel would have objected to Bailey's generic background descriptions of the "boyfriend pimp" business model in the pimping and pandering trade, let alone evidence that such failure did not meet an objective standard of constitutional reasonableness.

Mere conclusory hindsight, based on appellate counsel's attempts to stretch a desire for gender–bias free courtrooms into speculative evidentiary rulings, is not enough. Although appellate counsel argues and asserts as much in his briefing, appellate briefs are neither a substitute for nor a vehicle by which to provide expert testimony as to prevailing professional norms, nor can they retrospectively provide supporting *evidence* to satisfy the first prong of the IAC test.

Moreover, because deciding whether to object is inherently tactical, counsel may have simply decided not to object to these parts of Bailey's foundational descriptions of the human trafficking trade to avoid re–emphasizing to the jury that Brown closely fit the common subcultural archetype of the "boyfriend pimp." (See *Wilson, supra,* 111 Cal.App.5th at p. 1035 ["defense counsel could have decided not to object to avoid emphasizing the evidence that appellant fit the behavior pattern of a 'gorilla pimp' "]; cf. *People v. Harris* (2008) 43 Cal.4th 1269, 1290 ["while requesting an admonition was one tactical option, counsel could also have decided that objecting would focus the jury's attention … in ways that would not be helpful to the defense"].)

Once more then, because "[o]n this record, we cannot say 'there simply could be no satisfactory explanation' for defense counsel's failure to object … [Brown's] claim of ineffective assistance would be better pursued in a habeas corpus proceeding." (*Barrett, supra,* 17 Cal.5th at p. 1020.)

*iii. Conclusion*

Brown has failed to establish constitutionally deficient performance based solely on the four corners of the appellate record, and thus has failed to meet his burden to prove IAC on either of his contentions. (*Buck, supra*, 580 U.S. at p. 118; *People v. Thompson* (2022) 83 Cal.App.5th 69, 119.) "Based upon the present record, we conclude that defense counsel was not ineffective as a matter of law. [Brown's] claim[s] of ineffective counsel should be resolved in a habeas corpus proceeding instead of on appeal. In a habeas corpus proceeding [trial] counsel will have 'the opportunity to explain the reasons for . . . [his] conduct. "Having afforded the trial attorney an opportunity to explain, courts [will be] in a position to intelligently evaluate whether counsel's acts or omissions were within the range of reasonable competence." ' " (*Wilson, supra,* 111 Cal.App.5th at p. 1025.)

## IV. Conclusion

Brown's pimping conviction under section 266h is affirmed. His pandering conviction under section 266i, subdivision (a)(6) is reversed as it is unsupported by sufficient evidence and the sentence imposed on that count is thereby also vacated.

Brown may not be recharged or retried on that charge. (See *Tibbs v. Florida* (1982) 457 U.S. 31, 41–42; *Burks v. United States* (1978) 437 U.S. 1, 10–18; *People v. Anderson* (2009) 47 Cal.4th 92, 104; see also § 654 and *Kellett v. Superior Court* (1966) 63 Cal.2d 822, 825, 827 [When the prosecution is or should be aware of more than one offense in which the same act or course of conduct plays a significant part, all such offenses must be prosecuted in a single proceeding[.]"].)

## DISPOSITION

The judgment is affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. The superior court clerk is directed to prepare an amended abstract of judgment and serve it on the Department of Corrections and Rehabilitation and all necessary entities.

SNAUFFER, J.

WE CONCUR:

FRANSON, Acting P. J.

ELLISON, J.*

---

\* Retired Judge of the Fresno Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

46.